## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ERNESTINE HARGROVE, | |
| *Plaintiff*, | |
| v. | Civil Action No. 13-1320 (RDM) |
| AARP, | |
| *Defendant*. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Earnestine Hargrove brought this suit against her now-former employer, AARP,[1]

for alleged violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et*

*seq.*, and the D.C. Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401.01 *et seq.*  Hargrove,

who suffers from carpal tunnel syndrome, alleges that the AARP: (1) unlawfully refused to

accommodate her disability; (2) retaliated against her for requesting accommodations; and (3)

constructively terminated her by forcing her to work in conditions that were intolerable in light

of her medical conditions.  AARP has moved for summary judgment on all claims.  *See* Dkt. 28.

As explained below, the Court will **GRANT** in part and **DENY** in part AARP's motion.

## I.  BACKGROUND

For the purpose of evaluating AARP's motion for summary judgment, the following facts

are construed in the light most favorable to Hargrove, who is the nonmoving party.  *See*

*Arrington v. United States*, 473 F.3d 329, 333 (D.C. Cir. 2006).

---

[1]  AARP was previously known as the American Association of Retired Persons.

**A.      December 2000 to Summer 2010**

Hargrove, who holds advanced degrees in marketing and statistics, began work at AARP as a Senior Research Advisor in December 2000.  Dkt. 28-2 at 2–3 (Pl.'s Dep. 33–34); Dkt. 34-8 at 1.  She was responsible for, among other things, "advis[ing] clients, stakeholders, and AARP's senior management on all phases of research," including "conceptualization of a research agenda," "conduct[ing] or oversee[ing] . . . original research projects," "writ[ing] and publish[ing] reports and presentations," and making "recommendations for action growing from the research findings."  Dkt. 28-3 at 21.  Throughout her tenure at AARP, Hargrove worked primarily with the Publications Department.  Dkt. 28-2 at 5 (Pl.'s Dep. 36).

Hargrove has suffered from carpal tunnel syndrome since 1986 and underwent surgeries on her thumb and wrist for related conditions in 2002 and 2004.[2]  Dkt. 34-9 at 1–2 (Hargrove Aff. ¶¶ 3, 6); Dkt. 34-17 at 4.  In January 2002, her doctors directed her to type no more than three hours per day.  Dkt. 34-9 at 1-2 (Hargrove Aff. ¶ 6).  From December 2000 until the summer of 2010, AARP accommodated Hargrove's conditions to her satisfaction, providing her with a high-back chair, adjustable keyboard tray, voice-activated dictation software called Dragon Dictation, and staff support.  Dkt. 35 at 19; Dkt. 28-2 at 9 (Pl.'s Dep. 44); Dkt. 34-9 at 1–2 (Hargrove Aff. ¶¶ 4–9).  Dragon Dictation permits the user to dictate text to the computer, but it cannot be used to manipulate data, spreadsheets, databases, charts, or graphs.  Dkt. 34-9 at 2 (Hargrove Aff. ¶ 7).

According to Hargrove, during this time period, her then-supervisor, Linda Fisher, "ensure[d] [that] [Hargrove] had the [staff] supports [she] needed to perform [her] . . . duties"

---

[2]  A letter from Hargrove's doctor indicates that she may have undergone an additional surgery in 1986.  *See* Dkt. 34-32 at 1.

and that "interns and junior level people (specialists and analysts) . . . did much of the heavy computer use, especially data runs, [and] . . . the preparation of charts, graphs and spreadsheets for presentations and reports." *Id.* (Hargrove Aff. ¶ 9). Also during this time, Hargrove received largely (although not entirely) positive performance evaluations and other recognition for her work. Dkt. 35 at 4 (Pl.'s Statement of Material Facts ("SMF") ¶ 11).[3]

## B.    October 2010 Request for Accommodations

According to Hargrove, the situation changed beginning in the summer of 2010. Dkt. 35 at 21; Dkt. 28-2 at 3, 11 (Pl.'s Dep. 34, 46). In May or June 2010, Nileeni Meegama became her supervisor and, according to Hargrove, "[t]he last intern who provided consistent support for [Hargrove's] work left in August or September of 2010."[4] Dkt. 34-9 at 2 (Hargrove Aff. ¶¶ 10–11); Dkt. 34-16 at 16 (Meegama Dep. 127–28). Hargrove was on sabbatical from mid-August to September 2010. Dkt. 34-9 (Hargrove Aff. ¶ 12); Dkt. 28-2 at 14 (Pl.'s Dep. 58). Sometime

---

[3] Citing, *e.g.*, Dkt. 34-14 at 5 ("Exceeded Standards" in 2002); Dkt. 34-14 at 29 (2007 review stating that "[Hargrove] met her objectives this year . . . [A]fter a great deal of hard work and commitment, she has successfully put behind her some issues around staff interactions . . . ."); Dkt. 34-14 at 54 (2008 review stating that she "continues to demonstrate competence, commitment, and a high level of professionalism"); Dkt. 34-15 at 1 (2001 nomination for "Sustained Excellence" award); Dkt. 34-15 at 5–8 (2001–2003 $100 cash prizes for "extraordinary effort or creativity"); Dkt. 34-15 at 12–13, 18 (2006, 2008 certificates for "WORLD CLASS Recognition"); Dkt. 34-15 at 16 (2008 invitation to "Renewal Program"); Dkt. 34-15 at 26–28 (2009–2011 compensation profiles showing merit increases in pay). *See also* Dkt. 31-1 at 1 (Franzel Decl. ¶¶ 2–4) (stating that from 2003–2010, Hargrove received performance scores ranging from 100–125 on a scale of 0–200, except that in 2009 she received a "below average score of 95"). *But see* Dkt. 29-1 at 1–2 (August 3, 2010 closeout review from former supervisor to new supervisor Nileeni Meegama noting some issues with Hargrove's performance, including that "Publications leadership . . . expects a lot more from [Hargrove], and has been increasingly vocal about their lack of satisfaction").

[4] According to Hargrove, Meegama expressly refused to seek another intern because "interns were just too much trouble." Dkt. 39-2 at 2 (Hargrove Aff. ¶ 12). Meegama testified, however, that "there were opportunities for interns" to work in the department during "2010 through 2012." Dkt. 28-3 at 20 (Meegama Dep. 229).

after she returned in the fall of 2010, Hargrove "began to experience significant increases in the symptoms of her ailments in her hands, wrists, and arms." Dkt. 35 at 5 (Pl.'s SMF ¶ 13). She informed Meegama that she was concerned about her health and wanted to "avoid another [surgery]." Dkt. 34-9, at 3 (Hargrove Aff. ¶ 14). On October 12, 2010, Hargrove requested a meeting to discuss accommodations for her medical condition. Dkt. 29-1 at 75. She explained that her "doctor ha[d] restricted the number of hours of [her] computer use" and that she "need[ed] to stay within those guidelines." *Id.* In response, Meegama directed Hargrove to Sam Franzel, AARP's Human Resources Business Partner. Dkt. 29-1 at 76; Dkt. 34-9 at 3 (Hargrove Aff. ¶ 15). Franzel, in turn, met with Hargrove and "sent [Hargrove] to Albert Fierro, [AARP's] Director of Risk Management." Dkt. 34-9, at 3 (Hargrove Aff. ¶ 15). Meegama also made arrangements to acquire an updated version of Dragon Dictation, which was installed on Plaintiff's computer around March 22, 2011.[5] Dkt. 29-1 at 98; Dkt. 28-2 at 36 (Pl.'s Dep. 120).

On October 20, 2010, Fierro performed an ergonomic assessment of Hargrove's office and recommended that she try forgoing the use of a keyboard tray for three weeks, notwithstanding her doctor's recommendation that she use one.[6] Dkt. 34-9 at 3 (Hargrove Aff. ¶ 16); Dkt. 29-1 at 77–78. Fierro had studied and taught ergonomics and "professe[d] to a specialized knowledge of carpal tunnel, having suffered [from it] himself." Dkt. 35 at 6–7 (Pl.'s SMF ¶¶ 19, 22) (citing Dkt. 35-19, Fierro Dep. 18–19, 67–68). Fierro and Plaintiff also

---

[5] At some point, Meegama expressed concern that it was taking too long for the updated version of the software to arrive and directed an employee to reorder it. Dkt. 28-2 at 34 (Pl.'s Dep. 116). It is unclear whether, in the intervening period, Plaintiff had access to the old version of Dragon Dictation from the prior accommodations. Dkt. 28-2 at 30–31 (Pl.'s Dep. 108–109).

[6] Although Hargrove agreed to try placing the keyboard directly on the desk for three weeks, she contends that Fierro did not timely respond to her request to reinstall the keyboard tray. Dkt. 34-9 at 3 (Hargrove Aff. ¶ 16). At her deposition, however, Hargrove acknowledged that she "had to cancel" several follow-up appointments with Fierro. Dkt. 28-2 at 28–29 (Pl.'s Dep. 103–104).

discussed the need for a new high-back orthopedic chair to replace the one previously provided. Dkt. 34-9 at 3 (Hargrove Aff. ¶ 17).  Fierro did not assess the need for limitations on Plaintiff's computer use.  Dkt. 35 at 8 (Pl.'s SMF ¶ 26).[7]

On October 22, 2010, Meegama authorized the purchase of a new chair, keyboard wrist bridge, and mouse pad for Plaintiff.  Dkt. 29-1 at 79.  Plaintiff then asked Meegama, Fierro, and Franzel to wait to order the replacement chair until she could confer with her doctor and choose one that met his specifications.  Dkt. 29-1 at 78.  Plaintiff continued to consider which chair she wanted until August 5, 2011, sampling a number of different chairs and comparing their specifications in the interim.  Dkt. 29-1 at 104–127.  After Plaintiff informed Meegama of her selection, Meegama immediately authorized the purchase of the chair, and it arrived in September 2011.  Dkt. 29-1 at 127, 135.

On October 25, 2010, Franzel sent the "form required [to] request an accommodation under the Americans with Disabilities Act" to Hargrove by email, noting that "[t]he form requires both you and your doctor to complete the appropriate sections."  Dkt. 29-1 at 81.  On November 22, 2010, Hargrove told Franzel, Meegama, and Fierro that the required paperwork was almost done and that she would she would complete the "one outstanding item"—her "specific request"—by "the end of the [following] day."  Dkt. 29-1 at 84.  She further explained that her doctor's "reference to accommodations before" September 2010 was "based [on Hargrove] telling [her doctor] that we typically had interns and junior people who did a lot of the charts, graphs and presentations, and the last one was gone when [she] returned . . . in September."  *Id.*  The next day, Hargrove provided the certification from her physician, Dr.

---

[7]  The cited pages of Fierro's deposition were omitted from the summary judgment record.  For present purposes, the Court accepts Hargrove's account of his testimony.

Russell Rothenberg, stating that she suffered from long-term "chronic carpal tunnel[,] tendinosis [of] both wrists[,] osteoarthritis, [and] fibromyalgia"; that she "require[d] a voice activated computer, keyboard tray, computer mouse pad, high back orthopedic chair with arms, [and] limit[s] [on] repetitive motion activity [of] 1 hour 3 times per day"; and that she "had the above accommodations until 9/[20]10 and they were helping her."  Dkt. 34-20 at 1–2; *see also* Dkt. 29-1 at 83.  At the same time, Hargrove explained that she would send a separate email with the final form regarding her "specific requests [for accommodations]," although she had already spoken with Meegama "about some possibilities."  Dkt. 29-1 at 83.

From Thanksgiving Day 2010 until about December 20, 2010, Hargrove took leave to attend to her mother's health.  Dkt. 28-2 at 15 (Pl.'s Dep. 59).  On January 24, 2011, Meegama provided an "overall satisfactory" year-end review of Hargrove's 2010 performance.[8]  Dkt. 28-1 at 5 (Def.'s SMF ¶ 19).

## C.      February 2011 Request for Accommodations

On February 4, 2011, Hargrove submitted her specific request for accommodations, explaining that her mother's illness and subsequent death had delayed her submission.  Dkt. 34-22 at 1.  Her request stated that the only "[o]ffice set up" accommodation outstanding was the chair, which she still needed to select.  *Id.* at 2; Dkt. 29-1 at 104–127, 135.  She then made the following requests in accordance with her doctor's instruction that she "use the computer for no more than three one-hour periods in a day":

---

[8]  Meegama stated that Hargrove "was commended by her primary client as showing significant improvements"; that she was "a strong and diligent researcher"; that she was "professional in all of her interactions and [wa]s a stickler for delivering high quality materials"; and that she "stay[ed] on schedule," Dkt. 34-21 at 13.  Meegama flagged "strategic thinking" as an "area[] of opportunity for [Hargrove]."  *Id.*  This review corresponded to a score of 100 on AARP's scale from 0 to 200.  Dkt. 31-1 at 1 (Franzel Decl. ¶¶ 2, 4).

- Time from the research administrative specialist to finish up with formatting presentations and reports, much like he did for the Publications Strategic Plan last November.   He actually said he enjoyed that.

- That you keep my restrictions in mind as you re-structure the team and assignments.

- That I not be assigned projects with a short turn around that would require me to spend long hours of computer time (i.e., beyond the doctor's restrictions).

- That you keep in mind that the additional computer work to be provided by one of our vendors will not kick in until later this spring; and the editorial interest studies, in particular, have two magazine issues without additional vendor support.  I would like to ask that we work out the specifics of the computer use for those two issues.

Dkt. 34-22 at 3.  Hargrove explained that she was "able to complete all of the tasks . . . outlined" in her job description and that in light of the fact that "many of the tasks involve the use of the computer, . . . the real issue is . . . how that affects the timely delivery of products to [internal] clients."  *Id.* at 2.  She noted that many Publication Department deadlines were "not negotiable" and that "[i]n this fast paced environment, it's not just a matter of whether [she] [could] do the job, but how long it will take."  *Id.*

On February 23, 2011, Meegama replied that Fierro would be in touch about installing the new office equipment.  Dkt. 34-22 at 4.  She added, "[h]owever, [that she could not] approve [Hargrove's] request to limit [her] time spent each workday on the computer to three 1 hour periods."  *Id.*  Meegama went on to explain:

As you know, the work performed by Sr. Research Advisors involves a significant amount of time on the computer.  Indeed, the incumbents in this position spend the majority of their workday on the computer to meet the workload demands of the position.  In addition, as you acknowledge in your memo of February 4th, this is a fast-paced environment where the deadlines are often non-negotiable.  Given these factors, you would not be able to perform the essential functions of this position with the three-one hour limitation.  Similarly, I cannot limit your projects to only those with longer due dates as the position does require that incumbents respond in a timely manner to non-negotiable deadlines.  That said, we will continue to provide

you with administrative support, but as you know, this one individual [Administrative Specialist James Smoot] does support 12 other employees in the department. To the extent possible, I will try to prioritize his work so that he is able to provide you with the maximum assistance possible.

Earnestine, if you would like to discuss other options that could effectively assist you in performing your work, please do let me know.

Dkt. 34-22 at 4; Dkt. 35 at 9 (Pl.'s SMF ¶ 31). Meegama testified that from February 2011 through the end of 2012, Smoot's "one [top] priority . . . was . . . to assist [Hargrove] as requested [by Hargrove]," Dkt. 28-3 at 2, 7 (Meegama Dep. 57, 128), and that "if [Hargrove] asked for something that [Smoot] could not do, [Meegama] would identify the person who would help her,"[9] Dkt. 28-3 at 10–11 (Meegama Dep. 137, 146); *see also id.* at 5 (Meegama Dep. 84) (stating that "when [Plaintiff] was assigned a specific project there was clarification made as to who would provide the keyboarding support"). Meegama also testified that, notwithstanding her emailed response to Hargrove's request for accommodations, she tried to give Plaintiff projects that "require[ed] less keyboard use." Dkt. 28-3 at 10–11 (Meegama Dep. 137, 146); *see also* Dkt. 28-9 at 3 (Koppen Dep. 93) (team leader's testimony that Meegama asked her "to make sure that we don't overload [Plaintiff] . . . because she has restrictions [on] . . . us[ing] the keyboard"). Meegama and Franzel scheduled biweekly meetings with Plaintiff to discuss her accommodations. Dkt. 28-3 at 8 (Meegama Dep. 132); Dkt. 28-8 at 4–5 (Franzel Dep. 111–12),

Around the same time, in February 2011, as a result of a reorganization of Hargrove's department, "junior people" were no longer "regularly assigned to provide support to Senior Research Advisors." Dkt. 34-9 at 3 (Hargrove Aff. ¶ 13); Dkt. 35 at 9–10 (Pl.'s SMF ¶¶ 33–35). Under the reorganization, "people had to do their [own] administrative work unless . . . [Smoot]

---

[9]  Smoot was capable of providing clerical, or "production" assistance, such as using PowerPoint and "mak[ing] [a] document consistent throughout," but did not have the qualifications to give substantive, "programmatic" assistance. Dkt. 28-2 at 58–61 (Pl.'s Dep. 188–89).

or the Administrative Specialist was assigned to work with them on something specific.  And they had to check in with [Meegama] as to what their needs were." Dkt. 34-16 at 24 (Meegama Dep. 192).  Hargrove acknowledges that the reorganization was unrelated to her disability and "was done for legitimate cost-saving purposes." Dkt. 35 at 17 n.2.

In July 2011, Hargrove received a mixed mid-year review.[10] *Compare* Dkt. 35 at 10 (Pl.'s SMF ¶ 38) (characterizing review as "significantly lower" than before), *with* Dkt. 28-1 at 13 (Def.'s SMF ¶ 44) (describing review as "overall satisfactory").  Hargrove was absent from work for jury duty from August to September 2011.  Dkt. 34-9 at 4 (Hargrove Aff. ¶ 22).  Upon her return, she was directed to assist with an association-wide effort to reorganize filings, which "required extensive keyboarding . . . and lifting." *Id.*  Additionally, Hargrove "spent four to five hours per day keyboarding [to] . . . catch up with [her] substantive work." *Id.*  "Within a couple of days of [her] return to work, [she] experienced pain and numbness in [her] hands" and wrists. *Id.* (Hargrove Aff. ¶ 22–23).

**D.      October 2011 Request for Accommodation**

On October 25, 2011, Dr. Rothenberg wrote a letter to AARP stating that Hargrove's "carpal tunnel syndrome, osteoarthritis, and fibromyalgia . . . require her to only work on a computer one hour 3 times a day." Dkt. 28-3 at 26.  According to Hargrove, Meegama

---

[10]  The review included in the record does not indicate Hargrove's "overall performance rating." Dkt. 34-21 at 28.  Although Hargrove was described as "a very strong and capable researcher who . . . delivers quality research products," Meegama stated that she "needs to expand her ability to think more strategically . . . . In the last six months, [Hargrove's] workload was reduced by spreading [her] responsibilities to another staff person and outsourcing a component of her work—with the expectation that this would enable her to focus on a more strategic level, however this strategic focus is yet to be demonstrated." *Id.* at 23.  Meegama further stated that Hargrove had difficulty adjusting to the departmental reorganization, leaving "mid-level and junior staff feeling disrespected," and that "[c]lients have requested that [Hargrove] stay focused especially when following through." *Id.* at 23–24.  Meegama expressed optimism, however, about Hargrove's ability to improve on these matters.  *Id.* at 24.

responded "that she had not approved the accommodation when [Hargrove] had asked for it in February and . . . [would] not do[ ] so now," Dkt. 34-9 at 4 (Hargrove Aff. ¶ 24), and Meegama "[a]lmost immediately . . . began to take assignments away from" Hargrove—most notably, "the contracting for editorial interest studies, which [Hargrove] had introduced at AARP in 2004," Dkt. 34-9 at 4 (Hargrove Aff. ¶ 25). In Hargrove's view, "[a]ll or virtually all" of the projects to which she was assigned instead were at the lower Specialist level, rather than projects appropriate to a Senior Research Advisor. Dkt. 35 at 12 (Pl.'s SMF ¶ 45); Dkt. 34-9 at 4 (Hargrove Aff. ¶ 25). In Meegama's view, however, she was identifying "work that [Hargrove] could do" with "less [use] o[f] the computer." Dkt. 28-3 at 13 (Meegama Dep. 152); *see also* Dkt. 30-1 at 97 (October 18, 2011 email setting up meeting to discuss project schedule that would permit Hargrove to work within the restrictions on typing time); Dkt. 30-1 at 110–11 (October 31, 2011 email from Meegama to Hargrove listing work assignments and asking Hargrove to "[l]et [her] know if . . . [she] [thought] that any of the above cannot be done using Dragon"); Dkt. 30-1 at 99 (November 15, 2011 email from Meegama to Hargrove stating that she had "been trying to make sure that [Hargrove] ha[d] a very light workload" and asking that Hargrove let Meegama "know if there's anything else that involves heavy computer usage that [Meegama] [could] off-load to give [Hargrove's] hand time to heal").

E.    **Research Review Project**

On November 22, 2011, Dr. Rothenberg wrote a note in which he observed that, "[o]n examination today[,] [Hargrove] has significantly improved . . . with her current work accommodations," but also repeated his conclusion that Hargrove could "only work on a computer one hour 3 times a day." Dkt. 34-28, at 1; *see also* Dkt. 30-1 at 24 (December 12, 2011 email from Plaintiff noting improvement). Around the same time, Hargrove was assigned

to lead the "Publications Research Review."  Dkt. 28-1 at 14 (Def.'s SMF ¶ 53); Dkt. 28-9 at 3 (Koppen Dep. 93); Dkt. 30-1 at 7.  According to Hargrove, around this time "[i]t became typical for [her] to perform four or more hours each day of keyboarding in order to keep up with [her] work."  Dkt. 34-9 at 5 (Hargrove Aff. ¶ 26); Dkt. 35 at 13 (Pl.'s SMF ¶ 50).  In particular, Hargrove felt that "severe deadlines" and "multiple reworkings of" the Research Review project imposed by Meegama forced her to "work hours beyond [her] medical restrictions for days on end.  It appeared to [Hargrove] that [Meegama] had engineered this project to fail in order to have a basis for attacking [Hargrove's] work."  Dkt. 34-9 at 5 (Hargrove Aff. ¶ 27).

Meegama asked Hargrove to provide a schedule for completing the Research Review project within her keyboarding restrictions.  Dkt. 28-2 at 54 (Pl.'s Dep. 171).  Smoot was to provide keyboarding assistance on the project for up to five hours per week, Dkt. 28-9 at 3 (Koppen Dep. 93); Dkt. 30-1 at 26, and, during this time period, another Senior Research Analyst was made available to help Hargrove with statistical analysis, which could not be performed using Dragon Dictation, Dkt. 28-3 at 12 (Meegama Dep. 146–47).  On December 22, 2011, Hargrove provided a schedule that estimated the hours of clerical assistance required to meet the mid-January deadline imposed by the Publications Department.  Dkt. 28-2 at 55 (Pl.'s Dep. 173); Dkt. 30-1 at 24-25, 27–31.  The schedule required greater than five hours of assistance per week.  Dkt. 30-1 at 30–31.

In mid-January, the Research Review deadline was pushed back to February 28, 2012. Dkt. 30-1 at 37.  At the same time that Hargrove informed Meegama about this development, Hargrove once again raised the issue of assistance, asking Meegama whether she "[could] count on getting some help beyond [Smoot's] production assistance if there are needs that would take [her] beyond" the three-hour restriction.  Dkt. 30-1 at 37.  In response, Meegama expressed

11

confusion as to why Smoot could not provide the assistance requested "as [they] discussed." Dkt. 30-1 at 35.  Hargrove provided a revised schedule based on the February 28 deadline, which again estimated that she would need more than five hours per week of clerical assistance.  Dkt. 30-1 at 38–41.

On January 25, 2012, Hargrove received a "Meets" rating for her 2011 year-end review—the middle rating on a five-category scale.  Dkt. 29-1 at 61; Dkt. 31-1 at 2 (Franzel Decl. ¶ 5).  The review reflects that Hargrove and Meegama disagreed about the adequacy of the accommodations made by AARP, and whether the problems with Hargrove's work stemmed from AARP's failure to accommodate her disabilities and its retaliation against her request for accommodations or from a misunderstanding about Hargrove's job responsibilities.[11]  *See* Dkt. 29-1 at 42–48.

Hargrove sent a draft of the Research Review end-product—a PowerPoint slideshow—to Meegama on February 23, 2012.  Dkt. 30-1 at 54–55.  Hargrove and Meegama then exchanged emails reflecting confusion and/or miscommunications about whether February 29 was the due

---

[11]  In the employee portion of the review, Hargrove wrote that her "biggest challenge was in continuing to contribute despite AARP's failure to accommodate [her] . . . disabilities" and that "[o]nce [she] requested an accommodation . . . , [she] was assigned projects of a less-demanding sort—often performing tasks that are typically done by [lower-level employees] [and receiving a] . . . deliberate reduction in assignments."  Dkt. 29-1 at 42–43.

In the employer portion, Meegama wrote that AARP had in fact accommodated Hargove by "outsourc[ing] and/or reassign[ing] a significant amount of the computer work" and "provid[ing] [Hargrove] with additional administrative support."  Dkt. 29-1 at 47.  Meegama found Hargrove's complaints about workload "surprising," as she had "specifically requested" limitations on her computer time.  *Id.*  Meegama further explained that a client had requested that Hargrove be taken off a project; that Hargrove "expects [to] . . . perform management or supervisory functions . . . [but] that is not . . . her position, which requires that she actually perform the research, conduct the analysis, and write reports"; and that, though "there is no staff person . . . dedicated to performing clerical duties[,] . . . "[Meegama] [had] provided [Hargrove] with greater administrative support . . . than . . . her colleagues."  Dkt. 29-1 at 47–48.

date for the final product, whether others were supposed to review and provide feedback on a

draft before or after that date, and at what stage of the review Hargrove should add "insights" to

the slideshow—a summary of data that "tak[es] into consideration what the organization's needs

are and what the data can say to help them." Dkt. 28-9 at 2 (Koppen Dep. 66); Dkt. 30-1 at 56–

59. The deadline for the "[f]inal [d]raft" was then extended to March 19, and Meegama asked

Hargrove to let her know if Smoot "ha[d] any competing priorities." Dkt. 30-1 at 56. Hargrove

provided a revised slideshow on February 29, to which Meegama responded that it still lacked

"insights." Dkt. 30-1 at 63. Hargrove then responded by providing the slide numbers for the

insights in the slideshow. She also requested assistance making other revisions requested by

Meegama "[s]ince [she] [was] restricted to 3 one-hour periods on the computer." Dkt. 30-1 at

65.

Meegama added another analyst to the project on March 2 and "clear[ed] [Smoot's]

responsibilities [for the day]" so that he could help Hargrove. Dkt. 30-1 at 65, 74. When

Hargrove sent another revised slideshow that day, Meegama and other reviewers expressed

disappointment about the lack of "insights" and "flow" in the slideshow and its excessive length.

Dkt. 30-1 at 65, 67–69, 72–73. Meegama said that, in her view, the quality of the work product

and the delay in producing it reflected "issue[s] . . . of performance/knowledge rather than the

restriction on the amount of time spent on a keyboard," and that "re-assigning an essential

function of the job is not a reasonable request." Dkt. 30-1 at 69.

After the Publications Department reviewed the slideshow on March 14, 2012, the head

of that department sent Meegama an email stating that they were "very disappointed" in it,

especially after "[they] waited so long to get it." Dkt. 30-1 at 79. During an April 2012 project

debrief, Hargrove's team leader stated that it was "a huge black mark for [the] department" and

that it was "due entirely to [Hargrove's] fault" in failing to coordinate communication among the various staff who ultimately worked on the project.  Dkt. 30-1 at 94.

**F.**     **Plaintiff Leaves AARP**

Meegama testified at her deposition that, when Hargrove said that she was in pain, Meegama would offer her the opportunity to take Family Medical Leave Act ("FMLA") leave "[i]f she needed the rest" or time "to recover."  Dkt. 28-3 at 18 (Meegama Dep. 173).  On May 8, 2012, "at the direction of her doctor," Hargrove took two weeks' FMLA leave because of her "worsening arthritis and carpal tunnel syndrome and neuropathic pain of both hands and wrist." Dkt. 35 at 13 (Pl.'s SMF ¶ 51); Dkt. 34-29.  When she returned to work on May 30, 2012, she provided a note from her orthopedic surgeon stating that "she may start typing for 2 hours a day."  Dkt. 34-31.  The next day, Meegama and Franzel met with Hargrove to discuss "how she saw herself getting the job done with this restriction."  Dkt. 28-2 at 45–46 (Pl.'s Dep. 141–42); Dkt. 28-3 at 19 (Meegama Dep. 180).  Meegama then transferred editorial studies and non-qualitative research projects back to Hargrove based on their jointly held belief that the projects could be performed within the two-hour typing restriction by using Dragon Dictation.  Dkt. 28-2 at 45–46 (Pl.'s Dep. 141–42); Dkt. 30-1 at 5.  Meegama stated that Smoot would also "be available to provide keyboard assistance" when he returned to work in two days and encouraged Hargrove to let her know if she needed anything in the meantime.  Dkt. 30-1 at 5.  According to Meegama, she also offered for Hargrove "to work part time so that she could stay within this [restriction] and not injure herself further."  Dkt. 28-3 at 19 (Meegama Dep. 180).

Around July 24, 2012, Hargrove received a "Fails to Meet" Rating on her 2012 mid-year performance review and was told by Meegama that she would be placed on a Performance

14

Improvement Plan.[12]  Dkt. 28-2 at 17–18 (Pl.'s Dep. 75–76); Dkt. 29-1 at 74.  The performance

review reflects a continuing disagreement between Hargrove and Meegama about the source of

the underlying difficulty, with Hargrove asserting that the problem was the product of AARP's

failure to accommodate her disability, and Meegama stating that the problem was simply one of

performance.[13]  Dkt. 29-1 at 67–73.

On July 27, 2012, Dr. Rothenberg wrote yet another letter stating that Hargrove "is

restricted to only work on a computer one hour 3 times a day and she requires the use of a voice-

activated computer and an assistant to help her with excessive lifting of heavy objects."  Dkt. 34-

32 at 1.  On July 31, 2012, he provided a further letter stating that Plaintiff was examined and

had "a significant exacerbation of her tendinitis and carpal tunnel syndrome," as well as an ankle

sprain that limited her ability to walk.  Dkt. 34-33 at 1.  He further opined that Hargrove needed

---

[12]  Meegama wrote a Performance Improvement Plan memorandum on August 2, 2012, that
identified goals for "[s]trategic [r]esearch [e]xpertise"; "[t]eam [w]ork & [c]ollaboration";
"[c]ommunication"; and "[f]ocus & [d]eadlines."  Dkt. 34-21 at 67.  It also identified four
projects that Plaintiff would work on during a ninety-day period.  *Id.* at 67– 68.

[13]  In the employee portion of the evaluation, Hargrove wrote that AARP had "fail[ed] to
accommodate [her] . . . disabilities" and that she had received low-level assignments and
assignments "that required extensive computer use" with only "unreliable and unskilled"
administrative support.  Dkt. 29-1 at 67.

In the employer portion of the evaluation, Meegama wrote that

> AARP has made several accommodations . . . including the purchase of . . . office
> equipment, the provision of administrative support . . . , the extension of
> deadlines, the reduction in her workload, and the approval to telecommute as
> requested. . . . [N]one of the performance issues identified . . . have anything to do
> with her . . . disabilities . . . . [T]he deficiencies in [Plaintiff's] performance relate
> to her strategic and analytical abilities, as well as her communication and
> collaboration skills, none of which have anything to do with the amount of time
> spent on the keyboard.

Dkt. 29-1 at 70–71.  Meegama went on to provide a very negative evaluation of Plaintiff's
performance, stating that Plaintiff had difficulties with strategic thinking, colleague and client
relationships, focus and deadlines, and "adapt[ing] to changing business needs."  *Id.* at 71–73.

"one-month medical leave for recuperation [in light of] her current medical problems and aggravation of her chronic medical problems and physical therapy for her carpal tunnel syndrome." *Id.* Hargrove left AARP for a leave of absence, starting on either July 31 or August 1, 2012. Dkt. 28-2 at 19–20 (Pl.'s Dep. 76–77).

Hargrove never returned to work at AARP. She was ultimately approved for workers' compensation benefits based on temporary total disability, retroactive to May 2012, and for long-term disability benefits through AARP. Dkt. 31-1 at 2 (Franzel Decl. ¶¶ 6–7). She, then, remained in "inactive status" with AARP and received long-term disability benefits until January 12, 2015, when those benefits expired and her inactive status was administratively terminated. Dkt. 28-8 at 3 (Franzel Dep. 65); Dkt. 40-1 at 1–2 (Franzel Decl. II ¶¶ 3–4).

Meanwhile, on October 17, 2012, Hargrove provided AARP a "Fitness for Duty Certification" form completed by Dr. Rothenberg, which stated that she could return to work with the restriction of "1 hour computer work daily ([she] tried doing 2 hours at home – could not accomplish that) working ½ days 5 days per week." Dkt. 34-34 at 1. On November 19, 2012, Dr. Rothenberg provided another certification, stating that Hargrove "[was] slowly improving" and that she could do "computer work 1-2 hours as tolerated 5 days [per] week ½ days." Dkt. 34-34 at 2. On December 3, 2012, Dr. Rothenberg provided a third certification, stating that Hargrove could do "2 hours computer work [per] day 5 days [per] week [and] 6 hours work per day" with an "ergonomic office and computer accommodation." Dkt. 34-34 at 3. According to Hargrove, although she was "eager to return to work" and tried to do so by submitting these certifications to AARP, "AARP informed [her] that [she] could not return to work." Dkt. 34-9 at 5 (Hargrove Aff. ¶¶ 29, 31); *see also* Dkt. 34-34 at 4. Meegama testified that, in response to the certifications, she and others at AARP discussed whether "there was a

16

way to make this work," but determined that Hargrove could not "meet the essential functions of the job to get [it] done."  Dkt. 34-16 at 23–24 (Meegama Dep. 188–190).  When asked whether Hargrove's "performance at work [had] anything to do with the refusal to allow her to return to work," Meegama replied, "[n]ot that [she] recall[ed]."  *Id.* at 24 (Meegama Dep. 190).  As of September 23, 2014, Hargrove was "able to do some keyboarding, approximately 2 hours per day."  Dkt. 34-9 at 5 (Hargrove Aff. ¶ 30).

**G.     The Instant Suit**

Plaintiff filed an administrative complaint with the D.C. Office of Human Rights, alleging (1) failure to accommodate her disability, (2) hostile-work environment, and (3) retaliation.[14]  Dkt. 30-1 at 115–16.  The record does not indicate how the administrative complaint was resolved.  On July 31, 2013, Hargrove brought suit in the Superior Court of the District of Columbia, alleging failure to accommodate (Count I), retaliation (Count II), and constructive discharge (Count III) in violation of the ADA and the DCHRA.  Dkt. 1-1 at 14–16 (Compl. §§ 59–72).  AARP removed the action to this Court on August 30, 2013, Dkt. 1, and, after the parties engaged in discovery, moved for summary judgment on August 15, 2014, Dkt. 27-1.  The case was randomly reassigned to the undersigned Judge on January 6, 2015.

## II.  LEGAL STANDARD

To prevail on a motion for summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895–96 (D.C. Cir. 2006).  A fact is "material" if it is capable

---

[14]  The record does not indicate when Hargrove actually filed her administrative complaint, which she signed on September 10, 2012.  Dkt. 30-1 at 116.

of affecting the outcome of the litigation, *see Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895, and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party, s*ee Scott v. Harris*, 550 U.S. 372, 380 (2007); *Liberty Lobby*, 477 U.S. at 247–48; *Holcomb*, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  "The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider 'other materials in the record.'"  *Smith v. Lynch*, 106 F. Supp. 3d 20, 37 (D.D.C. 2015) (quoting Fed. R. Civ. P. 56(c)(3)).

The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified."  *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987).  In considering a motion for summary judgment, moreover, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006).  The non-movant's opposition, however, must consist of more than *ipse dixit* allegations or denials; to join issue with an adequately supported motion for summary judgment, the opponent must come forward with her own affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  That is, the opponent must provide evidence that would permit a reasonable jury to find in its favor.  *See Laningham v. United States Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  The Court is "not to make credibility determinations or [to] weigh the evidence," *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016), but, if the opponent's evidence is "merely colorable" or "not

significantly probative," the Court may grant a well-supported motion for summary judgment, *Liberty Lobby*, 477 U.S. at 249–50.

### III.  DISCUSSION

Hargrove alleges claims for failure to accommodate, retaliation, and constructive discharge in violation of the ADA and the DCHRA.  The Court addresses each claim in turn. Because "[n]either [Plaintiff] nor the [Defendant] treated [the DCHRA] as requiring an analysis different from that required by the [ADA], . . . [the Court] do[es] not separately address [the merits of] her DCHRA claim[s]."  *Minter v. District of Columbia*, 809 F.3d 66, 71 n.2 (D.C. Cir. 2015); *see also McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 5–6 (D.C. Cir. 2010) (treating DCHRA and ADA accommodation and retaliation claims together); *Katradis v. Dav-El of Washington, DC*, 846 F.2d 1482, 1485 (D.C. Cir. 1988) (applying Title VII standard to DCHRA disability-discrimination claim alleging constructive discharge).

### A.    Accommodation Claims

Hargrove first alleges that AARP unlawfully refused to accommodate her disability when Meegama "rejected . . . out of hand" her February 4, 2011 request to limit her "use [of] the computer [to] no more than three, one-hour periods per day" and when AARP subsequently "held firm to this view over the following eighteen months."  Dkt. 34-22 at 3; Dkt. 35 at 22–23. Specifically, Hargrove alleges that AARP failed to reasonably accommodate her by (1) providing adequate clerical staff support and (2) assigning her to projects with longer deadlines that did not require extensive typing.[15]  Dkt. 35 at 22–23.  She further asserts that, when AARP

---

[15]  On February 4, 2011, Hargrove requested four accommodations in support of her need to "use the computer no more than three one-hour periods in a day": (1) "[t]ime from the research administrative specialist"; (2) that her restrictions be kept in mind as the team was restructured; (3) that she "not be assigned projects with a short turn around that would require . . . long hours of computer time (i.e. beyond the doctor's restrictions)"; and (4) that she and AARP work out the

adequately accommodated her prior to the summer of 2010, she was able to perform the essential functions of her job. *Id.* at 19–20.

The ADA requires a covered employer to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . , unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business."  42 U.S.C. § 12112(b)(5)(A).  "This provision requires an 'employer [to] be willing to consider making changes in its ordinary work rules . . . in order to enable a disabled individual to work.'"  *Faison v. Vance-Cooks*, 896 F. Supp. 2d 37, 56 (D.D.C. 2012) (quoting *Vande Zande v. Wisconsin*, 44 F.3d 538, 542 (7th Cir. 1995)).  The ADA "expressly recognizes," for example, "'job restructuring' and 'part-time or modified work schedules' as reasonable accommodations," *Doak v. Johnson*, 798 F.3d 1096, 1105 (D.C. Cir. 2015), as well as "the provision of qualified readers or interpreters, and other similar accommodations," 42 U.S.C. § 12111(9)(B).  "To avert summary judgment" on a failure-to-accommodate claim, the plaintiff must adduce

> sufficient evidence to allow a reasonable jury to conclude that (i) she was disabled within the meaning of the [ADA]; (ii) her employer had notice of her disability; (iii) she was able to perform the essential functions of her job with or without reasonable accommodation; and (iv) her employer denied her request for a reasonable accommodation of that disability.

*Solomon v. Vilsack*, 763 F.3d 1, 9 (D.C. Cir. 2014) (internal citations omitted).

In its motion for summary judgment, AARP does not dispute that Hargrove is "an otherwise qualified individual with a disability," *see* Dkt. 37 at 1–2—that is, that she is disabled

---

specifics of computer use on two magazine issues.  Dkt. 34-22 at 3.  Her brief in opposition to the motion for summary judgment, however, discusses only the denial of accommodations with respect to the first and third requests, *see* Dkt. 35; *cf.* Dkt. 1-1 at 14 (Compl. ¶¶ 59–60) (incorporating all factual allegations into failure to accommodate count).

within the meaning of the ADA and that, "with . . . reasonable accommodation, [she] can perform the essential functions of the [job]," 42 U.S.C. § 12111(8) (defining "qualified individual"). Nor does AARP argue that it lacked notice of Hargrove's disability or that providing the accommodations she requested would have posed an undue hardship to it. Rather, although AARP is entitled to raise any of these additional defenses at a later date, for present purposes, AARP's argument rests exclusively on the contention that it did not deny Hargrove's requests for various accommodations. According to AARP, "the accommodations that AARP provided were exactly what Plaintiff requested in her February 4, 2011 memorandum," and, if accepted, that fact provides sufficient basis to enter judgment in AARP's favor. Dkt. 27-1 at 4–7.

Of course, "[a]n underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied." *Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999). Here, however, the question posed by AARP's motion for summary judgment is whether it granted or denied two of Hargrove's specific accommodation requests—her requests for staff support and assignment-based accommodations. Dkt. 35 at 22–23. As to the first, it is undisputed that Hargrove received *some* staff support, but Hargrove contends that insufficient support was provided to reasonably accommodate her. Hargrove concedes that in response to her February 4, 2011 accommodation request, Meegama directed Smoot to prioritize providing clerical assistance to Plaintiff. *See* Dkt. 35 at 33–35. She also offers evidence, however, that AARP made Smoot available to assist Hargrove for only five hours per week, Dkt. 30-1 at 26, and, on at least two occasions, Hargrove provided Meegama with schedules of the staff support required for her to meet deadlines within her restrictions that requested more than five hours of assistance per week,

Dkt. 30-1 at 30–31, 38–41.  And, although AARP on at least some occasions assigned persons

other than Smoot to provide assistance to Hargrove, *see e.g.*, Dkt. 28-3 at 5, 10–12 (Meegama

Dep. 84, 137, 146–47), Hargrove contends that this was not enough for her to stay within her

doctor's recommended restriction on repetitive motion while completing her work, Dkt. 34-9 at 5

(Hargrove Aff. ¶ 26).  At this stage of the proceedings, the Court cannot parse this disputed

evidence to determine how much clerical assistance was actually provided and whether it was

adequate to constitute a reasonable accommodation.  AARP has not demonstrated that there is

"no genuine dispute" that it granted Hargrove's request for staff support.  Fed. R. Civ. P. 56(a).

As for Hargrove's request for assignment-related accommodations, there is indeed some

evidence in the record that Meegama sought to assign Plaintiff to projects better suited to her

condition.  Meegama asked Hargrove's team leader, for example, not to "overload" Hargrove in

light of her restrictions on keyboard use, Dkt. 28-9 at 3 (Koppen Dep. 93), and on several

occasions she inquired whether Hargrove's assignments and workload were suitable, *see* Dkt.

28-3 at 13 (Meegama Dep. 152); Dkt. 30-1 at 97, 99, 110–11.  Meegama's February 23, 2011

response to Hargrove's request for accommodation, however, gives rise to a genuine dispute of

material fact with respect to this question.  In it, Meegama stated that she could not limit

Hargrove's time on the computer to three, one-hour periods because Senior Analysts "spend the

majority of their workday on the computer" and because "deadlines are often non-negotiable."

Dkt. 34-22 at 4.  She further stated that she could not "limit [Hargrove's] projects to only those

with longer due dates as the position . . . require[s] . . . incumbents [to] respond in a timely

manner to non-negotiable deadlines."  Dkt. 34-22 at 4.  Moreover, according to Hargrove, when

she reiterated her request for accommodations in October 2011, Meegama responded "that she

had not approved the accommodation when [Hargrove] had asked for it in February and . . . was

not doing so now." Dkt. 34-9 at 4 (Hargrove Aff. ¶ 24). These responses provide some evidentiary support for Hargrove's contention that her requests for these accommodations were refused.

AARP offers several responses. It points to evidence, for example, that, despite the language in her February 23, 2011 email, Meegama did take Hargrove's condition into account when making assignments. Yet, even accepting this evidence, the fact that Meegama at times took Hargrove's condition into account when making assignments does not conclusively or indisputably show that AARP in fact granted Hargrove's request for this accommodation. A reasonable jury could conclude, for example, that Meegama viewed adjustments to Plaintiff's assignments as something to be handled on an *ad hoc* basis as convenience permitted, rather than as part of a grant of a standing accommodation of a disability pursuant to Defendant's ADA obligations.

AARP further argues that Meegama's "initial denial" simply reflected her temporary, mistaken belief that Plaintiff was requesting a limitation on computer use, as opposed to a limitation on repetitive-motion activity. *See* Dkt. 27-1 at 7 n.5. But, AARP's reliance on Meegama's deposition testimony about what she meant does not foreclose Hargrove's contrary reading of Meegama's February 23, 2011 email. And, in fact, there is evidence in the record from which a reasonable jury could conclude that Meegama did understand Hargrove's requested accommodation as directed at typing, and not at *all* computer use—including use of the Dragon Dictation software. *See id.* (stating that "the wording in her doctor's certificate . . . referred to a limitation on repetitive motion activity only"); *see also* Dkt. 28-9 at 3 (Koppen Dep. 93) (teamleader's testimony that Meegama asked her not to "overload [Plaintiff] with work because . . . for periods of time she can't use the keyboard"); Dkt. 30-1 at 24–25 (email exchange

between Meegama and Plaintiff about whether time spent using Dragon Dictation counts against three-hour time limit). Meegama's response to Plaintiff's request for accommodations, moreover, suggests that she viewed assignment-related accommodations as incompatible with the essential functions of Plaintiff's job. That, however, is not the ground for summary judgment that AARP advances in its motion. As to the ground that it does advance—that it *granted* all of Hargrove's requests for accommodations—there remain disputed questions of material fact. It is the role of the jury, and not the Court, to weigh the conflicting evidence and the credibility of the witnesses on this issue. *See Wheeler*, 812 F.3d at 1113.

Finally, AARP argues that it reasonably accommodated Hargrove by providing a series of other accommodations to her: an ergonomic assessment, various pieces of office equipment, an updated version of Dragon Dictation, "offering [Hargrove] leave and the ability to go to part-time status; and . . . allowing [Hargrove] to telecommute periodically." Dkt. 28-1 at 7–8. Hargrove does not dispute that these accommodations were provided. Dkt. 35-1 at 4 (Pl.'s SMF ¶ 23). Rather, she contends that they are irrelevant because the question is "not whether AARP provided some accommodation to [her], but whether [it] properly denied the accommodation that [she] sought." Dkt. 35 at 31.

Neither party is entirely right. AARP argues "'[a]n employer is not required to provide an employee that accommodation he requests or prefers, the employer need only provide some reasonable accommodation.'" *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1305 (D.C. Cir. 1998) (quoting *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996)). AARP is, of course, correct that it was not required to accept each and every one of Hargrove's proposed accommodations simply because Hargrove proposed them. But, absent a showing of "an undue hardship," *id.* at 1303 (quoting 42 U.S.C. § 12112(b)(5)(A)), it was required to reasonably

24

accommodate her disability.  The fact that AARP adopted some of Hargrove's proposed

accommodations does not prove that it reasonably accommodated her disability.  AARP offers

no argument, for example, that the office equipment, dictation software, and flexible work

schedule met the statutory requirement, and, to the extent it suggests that these accommodations

were sufficient, that argument is not supported by *undisputed* facts.

Hargrove, for her part, also mischaracterizes the relevant test.  She is correct that at

summary judgment, courts generally assess whether the employer denied a reasonable request

for accommodation with respect to the particular request allegedly denied, rather than assessing

whether the employer's conduct was, in the aggregate, reasonable.  *See, e.g.*, *Solomon*, 763 F.3d

at 12 (weighing whether Plaintiff's challenge to the denial of a flexible schedule survived

summary judgment without considering her additional requests that "may have been intended as

alternative or temporary accommodations, or as complements to the flexible schedule"); *Faison*,

896 F. Supp. 2d at 59 (rejecting, absent an explanation of the denial of the specific request,

defendant's argument that "even if Faison had made appropriate requests for accommodation,

[defendant] made sufficient [other] efforts to reasonably accommodate her disabilities").  But her

assertion that the other accommodations that AARP made are wholly irrelevant to her ADA

claim is plainly incorrect.  As explained above, an employer is required to provide reasonable

accommodations, but not necessarily those that the employee initially requested.  *See Aka*, 156

F.3d at 1305.  "In order to determine the appropriate reasonable accommodation, the employer

may need to 'initiate an informal, interactive process' . . . which . . . 'should identify . . . potential

reasonable accommodations . . . .'"  *Faison*, 896 F. Supp. 2d at 57 (quoting 29 C.F.R.

§ 1630.2(o)(3)).  That process is "'a flexible give-and-take' between employer and employee 'so

that together they can determine what accommodation would enable the employee to continue

working.'"  *Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014) (quoting *EEOC v. Sears,*

*Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)).  The record reflects that AARP did make

significant efforts to engage in this process.

Despite these efforts, the Court cannot conclude that AARP has met its substantial burden

at the summary judgment stage to show either that there is no genuine dispute of fact that it

granted all of Hargrove's requests or that its denial of some of her requests was justified.  AARP

has not proffered *undisputed* evidence that the specific accommodations that Hargrove alleges

were improperly denied—further staff support, longer deadlines, and assignments that required

less typing—were actually provided; that any further requests that Hargrove may have made

were unreasonable; or that the accommodations that Hargrove agrees that AARP provided were

sufficient.  Moreover, although the record reflects that Hargrove's condition improved with the

accommodations that she received at the end of 2011, *see, e.g.*, Dkt. 30-1 at 24–25, it also

reflects that Hargrove suffered subsequent relapses and made subsequent requests for

accommodation, *see, e.g.*, Dkt. 30-1 at 38; Dkt. 34-29; Dkt. 34-33.  Finally, even if AARP had

moved for summary judgment on the ground that it denied only unreasonable requests,

"[d]etermining whether a particular type of accommodation is reasonable is commonly a

contextual and fact-specific inquiry."  *Solomon*, 763 F.3d at 9.  For this reason, "'[i]t is rare that

any particular type of accommodation will be categorically unreasonable as a matter of law.'"

*Doak*, 798 F.3d at 1105 (quoting *Solomon*, 763 F.3d at 10).

AARP might ultimately be able to show that it, in fact, granted all of Hargrove's requests

for accommodation.  For purposes of summary judgment, however, the Court cannot conclude

that the record is devoid of any contrary evidence and that no reasonable jury could find that

AARP declined to adopt significant accommodations that Hargrove sought.  AARP's motion for summary judgment as to Count I is, accordingly, denied.

**B.      Retaliation Claim**

Hargrove also alleges that, in response to her February 2011 request for accommodations, AARP unlawfully retaliated against her by "subject[ing] [her] to increasingly harsh working conditions that exacerbated [her] medical conditions" and by giving he "a poor mid-year performance evaluation."  Dkt. 1-1 at 14 (Compl. ¶¶ 62–63).[16]

It is unlawful under the ADA for a covered employer to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, . . . any right granted or protected by [the ADA]."  42 U.S.C. § 12203(b). In considering an ADA retaliation claim based on circumstantial evidence, the Court must "use the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."  *Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005).  Under that framework,

> the plaintiff must establish the three elements of a prima facie case of retaliation: first, that she engaged in protected activity; second, that she was subjected to adverse action by the employer; and third, that there existed a causal link between the adverse action and the protected activity.  Such a showing raises a rebuttable presumption of unlawful discrimination and shifts to the defendant the burden to rebut the presumption by asserting a legitimate, non-discriminatory reason for its actions.  If the defendant does so, the *McDonnell Douglas* framework disappears, and [the Court] must decide whether a reasonable jury could infer intentional discrimination from the plaintiff's prima facie case and any other evidence the plaintiff offers to show that the actions were [retaliatory] or that the non-[retaliatory] justification was pretextual.

---

[16]  Hargrove's brief in opposition to the motion for summary judgment also refers to AARP's "[r]efusal to [p]ermit [her] to [r]eturn to [w]ork" following her FMLA leave as "[r]etaliatory." Dkt. 35 at 39.  "It is well established," however, "that a party may not amend its complaint or broaden its claims through summary judgment briefing."  *Haynes v. Navy Fed. Credit Union*, 52 F. Supp. 3d 1, 8 (D.D.C. 2014) (internal quotation marks and alteration omitted).

*Id.* (internal quotation marks and citations omitted).  Here, AARP argues that Hargrove's retaliation claim fails because (1) she did not suffer an adverse employment action and, (2) even if she did, "she cannot prove that her request for accommodation was the 'but-for' cause of the alleged adverse employment actions."  Dkt. 27-1 at 8.  Hargrove does not directly respond to either argument.  *See* Dkt. 35.  But "a district court must always determine for itself whether the record and any undisputed material facts justify granting summary judgment."  *Grimes v. District of Columbia*, 794 F.3d 83, 95 (D.C. Cir. 2015) (quoting *id*. at 97 (Griffith, J., concurring)).

      1.    *Performance Evaluation*

AARP is entitled to summary judgment on Hargrove's retaliation claim to the extent the claim posits that Hargrove's post-February 2011 performance evaluations constitute a materially adverse action.  To be sure, "'[a]dverse actions' in the retaliation context encompass a broader sweep of actions than those in a pure discrimination claim," and, in particular, need not "'affect the terms and conditions of employment.'"  *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 n. 4 (D.C. Cir. 2008) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006)).  But, even under the "broad[]" meaning of "adverse action" applicable in retaliation cases, the plaintiff must still be able to show that "'a reasonable employee would have found the challenged action materially adverse.'"  *Id.* (quoting *Burlington N.*, 548 U.S. at 68).  As the D.C. Circuit has held, this means that "performance reviews typically constitute adverse actions only when attached to financial harms," such as evaluations that "could affect [the employee's] position, grade level, salary, or promotion opportunities."  *Id.* at 1199; *see also Ramsey v. Moniz*, 75 F. Supp. 3d 29, 53 (D.D.C. 2014); *Turner v. United States Capitol Police Bd.*, 983 F. Supp.

2d 98, 107–08 (D.D.C. 2013); *Taylor v. Mills*, 892 F. Supp. 2d 124, 142 (D.D.C. 2012); *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009).

Here, Hargrove alleges that she received "a poor mid-year performance evaluation" in retaliation for her "request for accommodation of her disabilities . . . in February 2011." Dkt. 1-1 at 14 (Compl. ¶¶ 62–63). That evaluation, however, does not meet the standard articulated by the Court of Appeals for finding adverse action in a retaliation case. AARP offers a declaration from its Human Resources Business Partner, Sam Franzel, explaining that "[a]t AARP, employees receive both mid-year and year-end performance reviews. The mid-year performance reviews do not have any effect on an employee's grade or salary. The ratings on the mid-year performance reviews are superseded by . . . the year-end performance reviews." Dkt. 31-1 at 1 (Franzel Decl. ¶ 1). Hargrove offers no countervailing evidence on this point, and the Court's own review of the record finds none. *See* Dkt. 37. Indeed, even if Hargrove had alleged that her year-end evaluation was also a product of retaliation, there is no evidence that her grade or salary was adversely affect by any of her evaluations. To the contrary, Hargrove submitted evidence that she received a merit-pay *increase* and incentive payments for her 2011 performance. Dkt. 34-15 at 28.

  2. *Working Conditions*

Hargrove's further allegation that she was subjected to "increasingly harsh working conditions" in retaliation for her February 2011 request for accommodations fares no better. Dkt. 1-1 at 14 (Compl. ¶ 63). The complaint fails to identify which working conditions Hargrove contends were imposed in retaliation for her request for accommodations. In its motion for summary judgment, however, AARP parses Hargrove's deposition testimony and concludes that the allegedly "harsh working conditions" involved the projects to which she was

assigned, Meegama's failure to stop other employees from undermining Plaintiff, Meegama

speaking to her harshly, another staff member being removed from publications work, and

negative performance evaluations.  Dkt. 27-1 at 9.  Defendant then provides legitimate, non-

discriminatory explanations with respect to each condition it identifies, with supporting citations

to the record.  *See* Dkt. 27-1 at 13–15.

In the ordinary case in which "an employee has suffered an adverse employment action

and an employer has asserted a legitimate, non-discriminatory reason for the decision," *Brady v.

Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008), "the only [remaining] question

[would be] the ultimate factual issue in the case—[retaliation] *vel non*," *Jones v. Bernanke*, 557

F.3d 670, 678 (D.C. Cir. 2009) (internal quotation marks omitted).  Hargrove's brief in

opposition to the motion for summary judgment, however, does not address the conditions

identified in AARP's motion, and she offers no argument or citation to evidence purporting to

show that AARP's asserted legitimate, non-retaliatory justifications were pretextual.  *See* Dkt.

35.  Nor has the Court's own review of the record identified evidence from which a reasonable

jury could conclude that AARP harbored a retaliatory animus.  Rather, the undisputed evidence

indicates that AARP readily agreed to make a number of significant accommodations—including

providing the ergonomic assessment, purchasing various pieces of office equipment, obtaining

an updated version of Dragon Dictation, offering Plaintiff leave and part-time status, and

allowing her to telecommute periodically, Dkt. 28-1 at 7–8 (Def.'s SMF ¶ 23–26); Dkt. 35-1 at 4

(Pl.'s SMF ¶ 23)—and that it also made at least some effort to provide staff support and to adjust

her assignments, Dkt. 28-3 at 13 (Meegama Dep. 152); Dkt. 30-1 at 97, 99, 110.  A dispute

subsequently arose as to whether further accommodations were warranted or required, but that is

insufficient for a reasonable jury to conclude that Defendant retaliated against Plaintiff in

violation of the ADA.  "[T]he denial of a request for accommodation" does not by "itself support

a claim of retaliation based on the request." *Floyd v. Lee*, 968 F. Supp. 2d 308, 334 (D.D.C.

2013).  If it did, "then every failure-to-accommodate claim would be doubled." *Id.*  Here,

Plaintiff has failed to adduce sufficient evidence to sustain a retaliation claim distinct from her

failure-to-accommodate claim.

Yet, even putting all of this aside, Hargrove's retaliation claim would still fail because

most, if not all, of the allegedly "harsh working conditions" she identified in her deposition do

not meet the test for "adverse action."  As explained above, the poor performance evaluations

that Hargrove eventually received do not constitute adverse actions, since they did not result in

any financial harm (or any other concrete injury).  Likewise, the other job-related criticisms and

behavior that she identified lacked the "requisite level of regularity or severity" to rise to

constitute material, adverse action.  *Baloch*, 550 F.3d at 1199; *see also Hussain v. Nicholson*,

435 F.3d 359, 366 (D.C. Cir. 2006) (recognizing claim of retaliatory hostile work environment

where employee was "subjected . . . to 'discriminatory intimidation, ridicule, and insult' of such

'sever[ity] or pervasive[ness] [as] to alter the conditions of [his] employment and create an

abusive working environment'" (quoting *Harris v. Forklife Sys., Inc.*, 510 U.S. 17, 21–22

(1993))).  The criticisms that were contained in the email exchanges pertaining to the Research

Review Project, *see, e.g.*, Dkt. 30-1 at 54, 63, 67–69, 72, for example, reflect "job-related

constructive criticism" rather than abusive comments that could be construed as retaliatory,

*Baloch*, 550 F.3d at 1199.  Similarly, Hargrove's complaints regarding the projects to which she

was assigned after requesting an accommodation do not clear the "adverse actions" hurdle, as

any changes AARP made to Hargrove's assignments were not accompanied by a drop in pay or

any other concrete harm.  *See Stewart v. Evans*, 275 F.3d 1126, 1135 (D.C. Cir. 2002) (noting in

a retaliation case that the "D.C. Circuit has held that minor changes in work-related duties or

opportunities do not constitute an actionable injury unless they are accompanied by some other

adverse change in the terms, conditions or privileges of employment"); *see also Mungin v.*

*Katten Muchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997) (agreeing with "other circuits

[that] have held that changes in assignments or work-related duties do not ordinarily constitute

adverse employment decisions if unaccompanied by a decrease in salary or work hour changes").

In the absence of any "objectively tangible harm," *Allen v. Napolitano*, 774 F. Supp. 2d 186, 200

(D.D.C. 2011) (quotation marks omitted), the Court cannot conclude that "a reasonable

employee would have found the" change in work assignments "materially adverse," *Baloch*, 550

F.3d at 1198 n.4. (quoting *Burlington N.*, 548 U.S. at 68).

    AARP's motion for summary judgment as to Count II is, accordingly, granted.

## C.    Constructive Discharge Claim

    Finally, Hargrove alleges that AARP constructively discharged her by "impos[ing] . . .

work conditions that . . . require[d] her to exceed her medically-mandated restrictions on

keyboarding" and "that were so intolerable that a reasonable person would have felt compelled to

resign." Dkt. 1-1 at 15 (Compl. ¶¶ 66, 69).  She further alleges that AARP "refused to permit

[her] to return to work following a medical leave unless [she] agreed to abandon her request for

accommodation." *Id. ¶* 68.

    AARP argues that Hargrove's constructive discharge claim cannot survive summary

judgment for several reasons.[17]  First, AARP argues that Hargrove's claim for constructive

---

[17]  In addition to the arguments discussed below, AARP argues that Hargrove's failure to accommodate claim cannot be sustained and that, as a result, her constructive discharge claim must also fail, Dkt. 27-1 at 22–23; and that Hargrove, in fact, never resigned, *id.* at 25.  Given the Court's conclusion that Hargrove's failure to accommodate claim survives summary judgment, *see supra* pp. 26–27, the Court need not consider the first of these arguments.  And, as AARP

discharge under the DCHRA is barred by the statute of limitations.  Dkt. 27-1 at 20–22.  As

AARP further explains, the DCHRA provides that "[a] private cause of action [under the statute]

shall be filed in a court of competent jurisdiction within one year of the unlawful discriminatory

act[.]"  D.C. Code § 2-1403.16(a); *see also Hammel v. Marsh USA Inc.*, 79 F. Supp. 3d 234,

238–39 (D.D.C. 2015).  Here, Hargrove alleges that she was constructively terminated on July

30 or 31, 2012, when she worked her last day at AARP.  Dkt. 28-2 at 19–20 (Pl's Dep. 76–77).

According to AARP, Hargrove did not file this lawsuit until August 22, 2013—approximately

three weeks after the one-year statute of limitations expired.  Dkt. 27-1 at 20.  Hargrove, in turn,

simply fails to respond to this argument.  *See* Dkt. 35.  That omission is surprising because

AARP is apparently incorrect.  The action was originally filed in the Superior Court and was

removed to this Court on August 30, 2013.  Dkt. 1 at 3.  The notice of removal, moreover, asserts

that the complaint was *served* on AARP on August 2, 2013—twenty days before AARP now

asserts the action was *filed.  Id.* at 2.  And, most significantly, the copy of the complaint attached

to the notice of removal bears a "received" stamp from the Superior Court dated July 31, 2013.

Dkt. 1-1 at 3.  Assuming that date stamp is correct and that Hargrove was not constructively

terminated until July 31, 2012, Hargrove's constructive discharge claim is timely.  Although it is

possible that Hargrove left AARP a day earlier, thus raising additional questions relating to the

statute of limitations, AARP has not carried its burden on this issue for purposes of summary

judgment.

Second, AARP argues that Hargrove's ADA claim for constructive discharge is barred

because she failed to exhaust her administrative remedies.  Dkt. 27-1 at 19–20.  AARP is correct

---

concedes, Hargrove's employment was "administratively terminated" on January 12, 2015, Dkt.
40-1 at 1–2 (Franzel Decl. II ¶ 4), thus mooting AARP's contention that Hargrove "is still an
AARP employee," Dkt. 27-1 at 25.

that, before bringing suit under the ADA, a plaintiff is required to exhaust her administrative

remedies.  *See Carson v. Sim*, 778 F. Supp. 2d 85, 92–93 (D.D.C. 2011); *Ellis v. Georgetown*

*Univ. Hosp.*, 631 F. Supp. 2d 71, 75 (D.D.C. 2009); *Gupta v. Northrop Grumman Corp.*, 462 F.

Supp. 2d 56, 58 (D.D.C. 2006).  Here, Hargrove filed a charge with the D.C. Office of Human

Rights, and, pursuant to the governing EEOC regulations, requested that the charge be "filed

with both the EEOC" and the DCOHR.[18]  Dkt. 30-1 at 116.  According to AARP, however, that

charge was insufficient because it did not include a claim for constructive discharge but, instead,

alleged only a failure to accommodate, imposition of a hostile work environment, and retaliation.

*Id.* at 115–16.

The Court is, once again, hampered in assessing this defense by the fact that Hargrove

wholly ignores the issue in her opposition brief.  See Dkt. 35.  And, the Court's task is further

complicated by the fact that "District [J]udges in this Circuit have not agreed" whether,

following the Supreme Court's decision in *National Railroad Passenger Corp. v. Morgan*, 536

U.S. 101, 114 (2002), a plaintiff alleging violation of the federal antidiscrimination laws is

required to exhaust administrative remedies with respect to each "discrete act[] of

discrimination."  *Rashad v. Wash. Metro Area Transit Auth.*, 945 F. Supp. 2d 152, 166 (D.D.C.

2013).  Historically, the D.C. Circuit permitted a Title VII plaintiff—and by implication, an

ADA plaintiff, *see* 42 U.S.C. § 12117(a); *Dahlman v. Am. Ass'n of Retired Persons (AARP)*, 791

F. Supp. 2d 68, 74 (D.D.C. 2011) (noting that ADA "incorporates" Title VII procedures)—to

bring a lawsuit asserting claims that were administratively exhausted or that were "like or

---

[18]  When a charge of disability discrimination is filed with the DCOHR pursuant to its work-sharing agreement with the EEOC "and the charging party requests that the charge be presented to the [EEOC], the charge [is] deemed to be filed with the [EEOC]" after a designated period of time.  29 C.F.R. § 1601.13.

reasonably related to the allegations" contained in the administrative complaint or that grew "out

of such allegations," *Park v. Howard University*, 71 F.3d 904, 907 (D.C. Cir. 1996) (quoting

*Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)).  In *Morgan*, however, the

Supreme Court considered the related question whether "acts that fall outside of the statutory

time period for filing [administrative] charges" with the EEOC "are actionable under Title VII,"

536 U.S. at 108, and concluded that "[e]ach incident of discrimination . . . constitutes a separate

actionable 'unlawful employment practice'" for purposes of Title VII's procedural requirements,

*id.* at 114.  Since that decision, "[m]ost judges in this district have held that plaintiffs alleging

discrete acts of discrimination . . . 'must exhaust the administrative process regardless of any

relationship that may exist between those discrete claims and any others,'" *Rashad*, 945 F. Supp.

2d at 166 (quoting *Coleman-Adebayo v. Leavitt*, 326 F. Supp. 2d 132, 137–38 (D.D.C. 2004)),

"although a handful of decisions have continued to apply the 'reasonably related' rule," *Achagzai*

*v. Broad. Bd. of Governors*, 2016 WL 471274, at *6 (D.D.C. Feb. 8, 2016).

      The Court is convinced that the "reasonably related" rule "no longer reflects the state of

the law." *Coleman-Adebayo*, 326 F. Supp. 2d at 137.  As *Morgan* admonishes, discrete acts of

discrimination "are not actionable if time barred, even when they are related to acts alleged in

timely filed charges." *Morgan*, 536 U.S. at 113.  More generally, that rule reflects the notion

that the procedural requirements of Title VII—and the ADA—must be assessed on a claim-by-

claim basis and that satisfaction of the procedural requirements for a "relate[d]" act of

discrimination is insufficient, except in those cases in which the "very nature" of the claim

"involves repeated conduct." *Morgan*, 536 U.S. at 114–15.  For these purposes, moreover,

"[d]iscrete acts" include actions "such as termination, failure to promote, denial of transfer, or

refusal to hire." *Id.* at 114.

Applying these principles here, one of two conclusions follows—neither of which permits the Court to sustain the ADA claim in Count III of Hargrove's complaint.  The Court might, on the one hand, conclude that Hargrove's claim for constructive discharge is not distinct from her claim for failure to accommodate.  Rather than stating a stand-alone claim, it merely asserts the full extent of the injury that Hargrove alleges she suffered as a result of AARP's alleged failure to accommodate her disability.  And, indeed, there is support for conclusion that "constructive discharge is not an independent claim." *Hammel*, 79 F. Supp. 3d at 245–46.  So understood, the claim "must be dismissed because [it fails to state] an independent cause of action." *Id.* at 245.  But, on the other hand, if the claim is viewed as distinct from Hargrove's claim for failure to accommodate, it must be dismissed for failure to exhaust.  Either way, however, the Court must dismiss Hargrove's ADA claim for constructive discharge.

This, then, leaves Hargrove's parallel DCHRA claim for constructive discharge.  Under D.C. law, "[a] constructive discharge occurs when the employer deliberately makes working conditions intolerable and drives the employee into an involuntary quit." *Joyner v. Sibley Mem'l Hosp.*, 826 A.2d 362, 372 (D.C. 2003) (internal quotation marks omitted).  According to AARP, Hargrove has failed to meet her burden on summary judgment of identifying evidence that would permit a reasonable jury to conclude that AARP "deliberately" made her working conditions intolerable for the purpose of forcing Hargrove to quit.  Dkt. 27-1 at 22.  The Court agrees.  Hargrove's opposition brief does not even attempt to identify any such evidence, and the Court, in its own review of the record, has been unable to do so.  To the contrary, as explained above, the record reflects that AARP made significant efforts to accommodate her.  *See supra* pp. 5, 8, 22–24.  Hargrove may ultimately be able to prove that AARP could reasonably have done more to accommodate her disability, but, even if she can do so, that would not come close to showing

36

that AARP intentionally created intolerable working conditions for Hargrove.  As far as the Court can discern—and as far as Hargrove's opposition has shown—there is no factual basis for that contention.

Finally, Hargrove complaint asserts that "AARP refused to permit [Hargrove] to return to work following a medical leave unless she agreed to abandon her request for accommodation," Dkt. 1-1 at 15 (Compl. ¶ 68), and her opposition brief asserts that "AARP has insisted to this very day that Dr. Hargrove cannot return to work," Dkt. 35 at 40.  Unlike Hargrove's contention that AARP deliberately created an intolerable workplace, this contention finds some support in the record.  *See, e.g.*, Dkt. 34-9 at 5 (Hargrove Aff. ¶ 29); Dkt. 34-16 at 23–24 (Meegama Dep. 186–90).  That, however, is not a "constructive discharge" claim—it is a claim that she was, in fact, terminated because of her disability.  Although arguably redundant with Hargrove's claim for failure to accommodate, the Court will deny AARP's motion for summary judgment on Court III to the extent that claim is construed in this narrow manner.

The Court, accordingly, grants AARP's motion for summary judgment with respect to Count III, except to the extent that count alleges that AARP terminated Hargrove because of her disability.

## CONCLUSION

For the reasons stated above, the Court **DENIES** AARP's motion for summary judgment with respect to Hargrove's accommodation claim, Count I, **GRANTS** AARP's motion with respect to Hargrove's retaliation claim, Count II, and **GRANTS** in part and **DENIES** in part AARP's motion with respect to Hargrove's constructive discharge claims, Count III.  The parties shall appear for a status conference on October 5, 2016, at 10:30 a.m. in Courtroom 21.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: September 9, 2016